Filed 3/25/21  Bledsoe v. Monster Beverage Corp. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CODY DEAN BLEDSOE, | |
| Plaintiff and Appellant, | E072569 |
| v. | (Super.Ct.No. RIC1412551) |
| MONSTER BEVERAGE CORPORATION et al., | OPINION **Public**—**Redacts material from sealed record** |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. Sunshine S. Sykes, Judge. Affirmed.

Parris Law Firm, Khail Parris; Burrage Law Firm, David Burrage; Whitten Burrage Firm and Randa Reeves for Plaintiff and Appellant.

Shook, Hardy & Bacon, Frank C. Rothrock, Gabriel S. Spooner and Victoria P. McLaughlin for Defendants and Respondents.

1

After suffering a cardiac arrest which caused permanent brain damage, Cody Bledsoe filed a lawsuit against Monster Beverage Corp. (Monster), alleging his consumption of their energy drink (Monster Energy) caused his injuries. He made several claims against the company on theories of product liability, negligence, fraudulent concealment, and deceptive trade practices. In their defense, Monster planned to show Bledsoe's injuries were caused by choking on a large piece of food, as well as that he suffered from a cardiac abnormality that put him at a high risk of cardiac arrest.

Before jury selection, the trial judge ordered the issue of causation be tried first, in the interests of judicial economy, because it was a threshold issue common to each of Bledsoe's claims. If the jury found his consumption of the energy drink was a substantial factor in causing his injuries, they would proceed to decide liability and damages in a second phase, and punitive damages in a third. However, after the first phase, the jury returned a unanimous defense verdict, and the judge entered judgment in favor of Monster.

On appeal, Bledsoe makes two main arguments for reversal. First, he argues the judge abused her discretion by bifurcating the issue of causation. Second, he argues the judge abused her role as the "gatekeeper" of expert testimony (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*)) by preventing his two experts from relying on various material as supporting their opinions that Monster Energy causes cardiac arrests. Bledsoe also challenges numerous other rulings, arguing their cumulative effect was prejudicial to his case. We conclude the judge's rulings were fair

and reasonable and, in any event, Bledsoe cannot demonstrate prejudice given the strength of the evidence of an alternate cause of his cardiac arrest. We therefore affirm.

# I

# FACTS

A.    *The Incident*

At the time of the incident, Bledsoe was 18 years old. He lived in Arlington, Texas with his mother, Kathy, and older brother, Trey, and attended community college to become a mechanic. The night before the incident, Bledsoe joined his family and friends to decorate a Knights of Columbus Hall near his home for his brother's wedding reception (Trey's wedding was scheduled to take place the next day). Bledsoe arrived at the hall around 9:00 p.m. with his then-girlfriend, Ruth, stayed for several hours, and left around 2:00 a.m.

When Kathy went home around 4:00 a.m., she found her son face down and unconscious on the floor of the living room. She called 911, and they gave her instructions for performing CPR while she waited for the paramedics to arrive. At this point Trey returned home, and he started CPR.

According to Bledsoe's medical records, fire department personnel arrived at 4:10 a.m. and began CPR. An electrocardiogram (EKG) administered by the paramedics at 4:15 read "asystole" (which means the heart is flatlining or not beating). At 4:26, they gave Bledsoe a shot of epinephrine and, a few minutes later, began defibrillating.

3

Fortunately, they were able to revive Bledsoe, and they rushed him to Arlington Hospital for further treatment.

The police report for the incident said Trey had reported there was "a large piece of food lodge[d] in his brother's mouth" when he started administering CPR. The report also noted "there was a plate of food down near the patient."

B.     *Bledsoe's Lawsuit and the Court's Decision to Bifurcate Causation*

Bledsoe sued Monster in December 2014. His complaint contained seven causes of action, including defective design and failure to warn under both strict product liability and negligence theories; negligent design, sale and manufacture; fraudulent concealment; and violation of the Texas Deceptive Trade Practices Act.

Both parties filed a significant number of in limine motions, and the judge began considering them on November 1, 2018. About halfway through the motions, and after a prolonged discussion of expert testimony and whether to allow Bledsoe to introduce evidence of one of Monster's alleged advertising strategies, the judge raised the issue of bifurcation. She explained she was beginning to think trying causation first could result in a "significantly shorter" trial. This was because causation was a threshold issue, a necessary element of each claim, and because "the time the causation witnesses would take would be significantly shorter than the totality of the witnesses." "The crux of the issue is really whether or not the Monster Energy drink caused the condition that the plaintiff suffered, the cardiac arrest, whether or not it was because of the energy drink. If the jury, in fact, finds it was not, then everything else falls to the wayside. [¶] I want to

4

hear from the parties why it would not be efficient to try the issue of causation first and then, depending on what the jury determines, then go from there."

The judge added that if she did try causation first, she would ensure the jurors did not know the issue was potentially dispositive. "Of course the jury wouldn't be told. We'd still time qualify the jury for the entire amount of time. The jury would be told that they have to decide this issue first. Opening statements would only deal with the causation. It would not get into any of these marketing issues or targeting issues. That's not relevant until causation is established. . . . It just seems a more efficient way to handle the trial. If, in fact, the jury found causation, then they would move on, the same jurors, to the next phase of the trial." The jury was time qualified until December 21, 2018.

Bledsoe's counsel objected because they were too close to trial. He said he understood the judge had the authority to bifurcate any issue and even understood why she thought it was a good idea to bifurcate causation in this case, but argued his team "might have taken every single video dep[osition] in a different way." He added that causation and damages were too related to separate, arguing "what kind of injury [Bledsoe] sustained and his symptoms are intertwined." He also argued it would be inconvenient for Bledsoe's mother, Kathy, who would provide testimony that was central to both what happened the night of the incident (causation) and the extent of her son's injuries (damages).

Monster agreed bifurcation was an economic option and argued it was not uncommon in this type of case. "[N]ot that it's binding, but a Court in Alameda

5

bifurcated the trial, put causation first and then marketing and damages off after that. . . . [¶] . . . [¶] With respect to the witnesses, it would be a tremendous saving. We'd go from 19 experts down to eight experts. . . . With respect to lay witnesses, a lot of them are already videotaped. They are done. And whether we cut half of it and play it [and] play the other half later, it doesn't involve them coming back." Responding to Bledsoe's objection that it was too close to trial to make this decision, counsel pointed out that the Code of Civil Procedure permits a party to file a motion to bifurcate as late as 30 days before trial, which, in this case, would have been well after the depositions had been taken anyway.

The judge disagreed with Bledsoe's counsel that causation was too intertwined with the other issues in the case to be separated. "I think that, as I stated before, the crux of the question is whether or not the Monster drink caused the injury. If, in fact, it did, then it did. We move on from there." The judge ordered the issue of causation bifurcated and tried first.

C.     *Bledsoe's Case*

Trial began on November 19, 2018. Bledsoe presented live testimony from Kathy, Trey, and two cardiologists who opined that his cardiac arrest was caused by his consumption of Monster Energy. He also presented deposition clips from several witnesses, including Ruth, the cardiologist who had treated him after the incident, and Monster's Chief Scientific Officer, Dr. Thomas Davis.

### 1.    *Dr. Lipshultz*

Dr. Steven Lipshultz is a board certified pediatrician who is also credentialed in cardiology. In his opinion, Bledsoe's consumption of Monster Energy caused him to experience a ventricular fibrillation, which is a type of arrythmia (or irregularity in heartbeat) where the heart muscle quivers or spasms instead of beating. He explained that a ventricular fibrillation, if not treated, will lead to a cardiac arrest.

Dr. Lipshultz said the combination of caffeine, taurine, and guarana in Monster Energy causes certain cardiovascular effects that increase the likelihood of ventricular fibrillation, namely: increased blood pressure, increased heart rate, platelet aggregation (which thickens blood and increases the risk of clotting), vasoconstriction (narrowing or constricting of the blood vessels), and prolongation of the QT interval (or, the time it takes the heart to relax after contracting and reset itself for the next heartbeat).

He summarized for the jury three published case studies that demonstrate the cardiovascular effects caused by Monster Energy. In one study, published in a 2014 letter to the editor of the *International Journal of Cardiology*, a healthy, 31-year-old volunteer drank two 16 ounce cans of Monster Energy over a 45-minute period. The study reported that EKGs administered about five hours later reflected prolonged QT intervals. In the second study, published in 2017 in the *World Journal of Cardiology*, 11 medical students fasted, drank one 24 ounce can of Monster Energy in one minute, then submitted to various tests 90 minutes later. The report concluded there was an association between consumption of Monster Energy and two biological effects: platelet aggregation and a

7

decreased neurological ability to control the dilation or constriction of blood vessels. The third study was conducted by the same principal as the second and was published in an abstract article in *Circulation* in 2018. Four healthy medical students each drank one 24 ounce can of Monster Energy and were tested 90 minutes later. This study concluded there was an association between the energy drink and three biological effects: vasoconstriction, increased heart rate, and increased blood pressure.

In Dr. Lipshultz's opinion, the taurine and guarana in Monster Energy had a synergistic effect when combined with caffeine, meaning the combined effect of the ingredients is greater than the sum of each ingredient's effect on its own. As in, "one plus one plus one is greater than ten." To support this conclusion he explained, "when we look at studies . . . of healthy people who get a caffeinated beverage versus a Monster Energy Drink . . . the effect on some of these same [biological effects] is greater than just caffeine alone."

In reaching his specific opinion about the cause of Bledsoe's cardiac arrest, Dr. Lipshultz came up with a "range of Monster Energy beverage that [Bledsoe] consumed" in the 24 hours before his cardiac arrest: anywhere between two and four 16 ounce cans. He explained that this quantity of Monster Energy combined with certain environmental factors, created a "perfect storm" for a ventricular fibrillation. He said Bledsoe was part of a particularly vulnerable or high risk population when it came to energy drink consumption because he was also taking allergy medication (Allegra) and was under a lot of stress in the 24 hours before the incident, helping prepare for his brother's wedding.

Dr. Lipshultz dismissed the possibility Bledsoe had choked because there was no evidence he had petechiae (burst blood vessels on the face) or cyanosis (blue discoloration of the lips). He also pointed out that the paramedics' notes reflect they were able to intubate Bledsoe without incident, which, he believed, wouldn't have been possible if he had choked because there would be food wedged in his trachea.

On cross-examination, he admitted he had reached his opinion about the cardiovascular dangers of Monster Energy without knowing the amounts of the ingredients in the drink. He also admitted he didn't know how much Monster Energy Bledsoe had ingested in the 24 hours before his cardiac arrest.

### 2. *Dr. Shah*

Dr. Anjan Shah is a board certified pediatric cardiologist and a general physician. He shared Dr. Lipshultz's opinion that the ingredients in Monster Energy caused cardiovascular effects that lead to ventricular fibrillation and that Bledsoe's cardiac arrest was the result of his consumption of Monster Energy.

Dr. Shah said cardiovascular complications from energy drink consumption was becoming an "increasing problem" he was seeing in his practice. "I see patients all the time who have various different types of cardiovascular complications from taking in substances or whatnot. In this case, specifically Monster. I probably see at least one or two patients a month that have some sort of symptoms, be it from palpitations or chest pain or passing out, who—it's due to their having excessive consumption of Monster. And these are mostly teenage kids that I'm seeing, and . . . I restrict them from having

9

Monster and they tend to get better." Like Dr. Lipshultz, he also relied on the three case studies involving Monster Energy as evidence the product is dangerous to one's cardiovascular health.

Dr. Shah had examined Bledsoe in 2015. He ran various genetic tests to look for mutations or disorders that would affect his heart and potentially cause a cardiac arrest, but found none. He said Bledsoe's EKGs indicated he had early repolarization syndrome, an abnormality in the heart's electrical system that effects the way the heart relaxes after a contraction to reset for the next heartbeat. He said in some cases the syndrome can be dangerous or life-threatening, but he had concluded in Bledsoe's case the syndrome was benign.

Dr. Shah also believed Bledsoe was particularly vulnerable to the effects of caffeine at the time of the incident, because he was also taking allergy medication and was under a lot of stress. Like Dr. Lipshultz, he also assumed Bledsoe drank between two and four 16 ounce cans of Monster Energy before his cardiac arrest.

On cross-examination, Dr. Shah admitted he didn't know the amounts of the ingredients in Monster Energy. He also admitted he based his assumptions of how much Monster Energy Bledsoe drank before the incident off what Kathy had told him about her son's consumption. He explained, "we had to acknowledge that it was a large enough amount. So, you know, I don't know the exact amount, but it was probably, you know, in the two- to four-can range where it would be in the—in the range where it would potentially be significant." He was unaware of Kathy's deposition testimony where she

10

admitted she hadn't actually seen Bledsoe drink any Monster Energy on January 3 or 4, 2013.

Dr. Shah admitted he didn't know which allergy medication Bledsoe was taking at the time of the incident. When asked why he believed Bledsoe had been under a lot of stress, he said it was his understanding Bledsoe had been up late studying for exams. When counsel informed him the incident occurred during winter break and that Bledsoe wasn't in school at the time, Dr. Shah responded, "I don't know whether he was studying or what he was doing, . . . but he was up doing activities. And if you're up at those hours, you're generally doing something that is going to cause you some degree of stress."

On redirect, when asked whether he still believed Bledsoe's cardiac arrest was caused by energy drink consumption, Dr. Shah said, "I think it's—it's medically certain. I mean, . . . there's nothing else that could have caused it."

3.    *Kathy Bledsoe*

Kathy said her son was a regular drinker of Monster Energy. She estimated she saw him drink two to three cans a week. When she left for work around 10:00 a.m. on January 3, 2013, he was playing video games in the living room. She noticed there was a Monster Energy can next to him, but she didn't see him drink out of it.

She left for work and didn't see him again until around 9:00 that evening, when he arrived at the hall to help decorate for Trey's wedding. She said the hall was large and she was busy decorating, so she didn't see whether he drank anything while he was there.

11

Around 2:00 a.m., he said goodbye to her and left because he was tired. About a half-hour later, she called him and asked him to take out the trash.

When she got home around 4:00 a.m., she found her son in the living room, lying face down on the floor, unconscious. She dialed 911 and moved the coffee table next to him to make space for CPR. She recalled that a can of Monster Energy fell off the table as she was moving it and spilled on Bledsoe (she didn't know if it was the same can she'd seen in the living room that morning). Trey came home then and started CPR while she talked to the dispatcher.

The paramedics arrived and were able to revive Bledsoe. They took him to Arlington Hospital, where he stayed for two weeks, recovering from his cardiac arrest and resulting anoxic brain injury (which occurs when the brain is deprived of oxygen). He was then transferred to a different hospital, in Dallas, where he underwent surgery to have an intracardiac defibrillator (ICD) implanted in his heart, a device that detects arrythmias and arrests and administers a shock to reset the heart.

Kathy said as a result of his brain injury, her son suffers from double vision, slow speech, myoclonus (involuntary muscle seizures), difficulty walking, and weakness in his left side. He uses a walker for short distances and a wheelchair for longer distances and he can no longer drive.

On cross-examination, Kathy said Bledsoe had been a habitual caffeine drinker, consuming, on average, a large iced tea and about two to three cans of Dr. Pepper or

Mountain Dew a day, in addition to energy drinks. He would also occasionally drink Starbucks coffee.

Kathy said Bledsoe still drinks caffeine, but no longer drinks Monster Energy. Since his cardiac arrest, his ICD has administered a shock to his heart on three separate occasions.

### 4. *Trey Bledsoe*

Trey said he came home from the hall around 4:00 a.m. to find his mother on the phone with 911, next to his brother. He immediately started CPR. He distinctly remembered that as soon as he started mouth-to-mouth, his brother let out a long belch that smelled like sour cream and onion pringles. He adamantly denied removing any food from his brother's mouth and maintained the officer who wrote the police report was mistaken.

On cross-examination, Trey said Bledsoe regularly drank a range of caffeinated beverages before the incident (including other energy drinks like Red Bull and Redline) and still drinks iced tea. He estimated his brother used to drink about two to three cans of Monster Energy a week.

### 5. *Ruth Boyer*

Ruth dated Bledsoe from 2011 until 2015 and has known him for most of her life. She recalled that when he picked her up to decorate the hall, he had a can of Monster Energy in his cupholder. She didn't see him much while they were decorating, but

13

remembers that at some point she saw him take a sip from a can of Monster Energy. She didn't know whether it was the same can from the car.

Ruth said Bledsoe would regularly drink about three cans of Monster Energy a week. He also regularly drank sodas and iced tea, and sometimes he would drink another brand of energy drink called 5-hour Energy.

### 6. *Lizzie Danley*

Lizzie Danley is Kathy's longtime friend and has known Bledsoe for most of his life. She was at the hall that evening and remembers him "goofing off" with his friends, hanging out and playing leapfrog. She couldn't remember if she'd seen him with a can of Monster Energy that night, but said that he often drank Monster Energy. She recalled a time she had borrowed his car and there were empty water bottles and Monster Energy cans littering the floorboards.

### 7. *Dr. Graceffo*

Dr. Graceffo was Bledsoe's treating cardiologist at Arlington Hospital. He didn't make any determination about the cause of his cardiac arrest, and he hadn't seen Bledsoe or spoken with him or his family since he was discharged from the hospital.

### 8. *Dr. Davis*

Finally, Bledsoe played a video clip from the deposition of Dr. Thomas Davis, Monster's Chief Scientific Officer, in which he agreed that consuming Monster Energy could possibly increase blood pressure and heart rate "depending on the amount you drink."

14

D.    *Monster's Case*

Monster presented evidence from eight witnesses—six experts plus video clips from the depositions of the two police officers who responded to Bledsoe's home on the morning of the incident.

1.    *Officer Petty and the police report*

Officer Robert Petty had been a police officer for 16 years. He responded to the Bledsoe home on January 4, 2013 and conducted interviews of Kathy and Trey shortly after the paramedics had arrived. He completed the report through dictation shortly after the interviews, in the early morning hours of January 4. He recalled the incident and the interviews, and he confirmed Trey had told him he'd removed a large piece of food from his brother's mouth.

The police report says: "I arrived on scene at approximately 0411 hrs and upon arrival I met with EMS and Fire personnel who[] were in the living room of the residence conducting CPR on the patient who was later identified as Cody Bledsoe . . . Also at the location was the patient's mother who was identified as Kathy Bledsoe [] along with the patient's older brother who was identified as Trey Bledsoe [].

"I spoke with the patient's mother and older brother whom advised that they had been at the Knights of Columbus Hall on Cooper St preparing and decorating for a wedding on Saturday. Both subjects advised that approximately 0200 hrs the patient advised that he was tired and was going to go home and get some sleep. Both field contacts advised that they had returned home at approximately 0400 hrs where they had

15

located the patient lying face down on the floor in the living room. Trey Bledsoe advised that he had went over to roll his brother over and determined that he was not breathing and was unresponsive. He began CPR as his mother contacted 911. *Trey also advised that as he was beginning CPR that there was a large piece of food lodge in his brother's mouth.* He advised that EMS then responded to location and began and continued with the CPR efforts. Patient does have Hypoglycemia but no other medical conditions and is not under the Doctor's care. There is no history of drug or alcohol use and is unknown why the subject had collapsed and was found unresponsive. The location was secured upon their arrival and there was no disruption at the location. . . ."

"[Redacted material] This is based on the fact that *there was a plate with food down near the patient and based on the fact that the patient's brother had located food in the subject's mouth.*" (Italics added.)

        2.    *Detective Vara*

Detective Alexandra Vara said she remembered responding to the Bledsoe home because it had "stood out a little bit more than any other call." She remembered the older brother was supposed to be getting married that day and that someone from the fire department had accidentally hit one of the Bledsoes' cars when they pulled up to the home. "[A]nd I just remember feeling really sorry for them because they'd already been through an unfortunate event and then for their vehicle to also be struck by the fire engine." She confirmed that near Bledsoe she had seen a plate of food, which she believed was pizza.

16

3. *Expert testimony*

a. *Ingredient safety*

Dr. Ashley Roberts, a food scientist with a Ph.D. in toxicology, had analyzed each of the ingredients in Monster Energy and concluded they are safe for human consumption at the levels present in the drink. He also concluded there is no adverse synergistic effect from the combination of the ingredients. He explained that taurine is an amino acid that we produce naturally and that is present in a wide variety of foods, including meat and fish, and guarana is an herbal extract that contains a small amount of caffeine. He found the only ingredients in the drink that interact with each other are caffeine and taurine, and taurine reduces the cardiovascular or stimulant effects of caffeine.

To reach these conclusions, Dr. Roberts followed the process the FDA uses to determine whether an item is "generally recognized as safe" or "GRAS"—he and his team drafted a report detailing their analyses and conclusions, which they then submitted to a panel of experts in the field of food safety. The panel agreed with Dr. Roberts' assessment, that the ingredients in Monster Energy are safe for consumption.

Monster presented two other experts on ingredient safety. Dr. David Johnson is an Associate Professor of Pharmacology at Duquesne University in Pennsylvania. He analyzed each of the ingredients in Monster Energy and concluded they are safe individually and in combination. He also found no synergistic effect among the ingredients. He explained that caffeine doesn't become toxic until you ingest about 10 grams, and because there is only 166 milligrams of caffeine in a 16 ounce can of Monster

17

Energy, a person would have to drink 62 cans to consume a toxic amount of caffeine. He explained that if a person who had not built up a tolerance to caffeine drank multiple cans of Monster Energy, they may experience jitteriness or nausea, "but when it comes to something like ventricular fibrillation, the caffeine in a Monster Energy would not cause that."

Dr. Jeffrey Brent is a board certified physician in medical toxicology and also holds a Ph.D. in biochemistry. His practice focuses on the intensive care of patients who have been poisoned (by, for example, hazardous materials or snake venom) or are suffering from substance abuse. He also studied the ingredients in Monster Energy and concluded they are safe alone or in combination. He said that a medium Starbucks coffee contains 330 milligrams of caffeine, which is over twice the amount of caffeine in a 16 ounce can of Monster Energy.

b. <em>Choking as the cause of Bledsoe's cardiac arrest</em>

Dr. Martin Tobin is a physician who is board certified in pulmonology, internal medicine, and critical care. He has written 16 books in the field of pulmonology and served as the Editor in Chief of the *American Journal of Respiratory and Critical Care* for five years. Based on his review of Bledsoe's medical records, the police report, and the deposition testimony of various witnesses, he reached the conclusion that his cardiac arrest was caused by food asphyxiation, or choking.

He said choking is the sixth most common cause of death and explained that, contrary to Dr. Lipshultz's understanding, asphyxiation is not always caused by food

18

becoming lodged in the trachea. He said a person can choke when food becomes lodged in the back of their mouth or upper throat (in medical terminology, the oropharynx). Food that is stuck in this location will block the air that would normally come through the nasal passage. When this happens, a person will usually try to swallow the food or breath in through their mouth, both of which result in a negative pressure that keeps the food in place. "[B]y doing what anybody would do, trying to breathe past it, then the negative pressure in your thorax will be transmitted up to your upper airway," and the "walls of your upper airway will just come in" and you will "turn a partial blockage into a complete blockage." Significantly, when food is lodged in the back of the mouth, it can press against a bundle of nerves located in the upper airway called the "vagus nerve." When the vagus nerve is stimulated, it causes the heart rate to slow. If the food remains in place, "that slowing of the heart rate can progress, causing a full-blown cardiac arrest."

Dr. Tobin said the evidence indicated that this is precisely what happened to Bledsoe. The report from the paramedics reflects that Bledsoe's initial EKG reading, at 4:15 a.m., was "asystole," meaning his heart had flatlined or stopped beating. This, he explained, is inconsistent with Bledsoe's experts' opinion that he suffered an arrythmia or ventricular fibrillation.

The paramedics' report also reflects that when they inserted an endotracheal tube into Bledsoe's airway, they found high levels of carbon dioxide, which is what you'd expect to see if a cardiac arrest is the result of asphyxiation. In addition, Bledsoe's charting notes say the physician heard "rhonchorous" breathing through the stethoscope,

19

which is also consistent with food asphyxiation. "If somebody has a pure cardiac arrest, you do not expect to be hearing any sounds that are occurring within the lungs. He's describing the lungs that are telling you that there is some obstruction in the airways."

Finally, the x-rays taken of Bledsoe shortly after the incident show that his lungs contained "pulmonary infiltrates," or particles, another common consequence of food asphyxiation. In fact, the physician who administered the x-rays wrote a note that says "aspiration v. CHF"—meaning choking versus congestive heart failure—and had Bledsoe put on Zosyn, an antibiotic that prevents infection from developing in the lungs as a result of infiltrates. Responding to Dr. Lipshultz's comments about the absence of petechia and cyanosis, Dr. Tobin said that pulmonologists do not view either as a common sign of choking.

c. *Bledsoe's early repolarization syndrome*

Dr. Hugh Calkins is a board certified cardiologist and electrophysiologist. He went to Harvard Medical School and is currently the head of electrophysiology at Johns Hopkins Hospital. Dr. Calkins reviewed Bledsoe's medical records and medical history and, like Dr. Shah, concluded he has early repolarization syndrome. The syndrome is "an electrical abnormality of the heart" that predisposes patients to "a high risk of sudden cardiac death." He said the syndrome is responsible for 31 percent of unexplained cardiac arrests.

Dr. Calkins showed the jury how three of Bledsoe's EKGs—one taken the day after his cardiac arrest and two taken months after—contained classic indicators of early

20

repolarization syndrome. He also explained that Bledsoe's "clinical course" both before and after the incident was "very consistent" with the syndrome. About a year before the incident, Bledsoe had passed out during class, an event his physician had mistakenly attributed to possible hypoglycemia. After the incident, he had suffered at least three cardiac incidents, all of which Dr. Calkins believed would have been cardiac arrests had Bledsoe's ICD not activated and administered a life-saving shock. Dr. Calkins explained that if someone has early repolarization syndrome, you would expect them to have multiple incidents, like Bledsoe has had, because you are born with the syndrome and it lasts your entire life. ICDs or defibrillators "get put in for a lifetime because your risk of cardiac arrest is there as long you're alive. [Bledsoe] was born with this abnormality."

In Dr. Calkins' opinion, Bledsoe's choking likely triggered his heart's inability to reset after contracting by stimulating his vagus nerve. "[W]hen you choke, you stimulate the vagal nerve and the cardiac arrest that occurs in patients with early repolarization syndrome happens during times when they have high vagal tone. So high vagal tone would be a situation where a cardiac arrest from early repolarization syndrome could occur. And if he had choked, that would increase vagal tone."

Based on the fact Bledsoe has, at this point, suffered multiple cardiac arrests, Dr. Calkins disagreed with Dr. Shah's opinion that his early repolarization syndrome is benign. He also disagreed with Dr. Shah's opinion that Bledsoe's initial cardiac arrest was caused by drinking Monster Energy. He explained that caffeine is generally safe for human consumption in moderate amounts and that the medication prescribed to people

21

with early repolarization syndrome operates to increase one's QT interval, so if anything, drinking caffeine would have helped or protected against a cardiac arrest. "And, in fact, stimulants make [the syndrome] better. So studies have shown that if you give adrenaline to someone with early repolarization syndrome, if they're having crazy arrests like every day, every hour, if you give them adrenaline, they quiet down and go away. To the degree that the Monster Energy have some caffeine that's a mild stimulant, you would expect Monster Energy drink to help prevent an episode."

### d.     *Rebuttal of Bledsoe's experts' methodology*

Dr. Dominik Alexander, a Ph.D. in epidemiology, performed an epidemiological evaluation of whether Monster Energy could cause a cardiac arrest and, if so, whether it did in this case. He told the jury that he was unable to find even a statistically significant *association* between Monster Energy and cardiac arrests, let alone evidence of *causation*.

He explained that the three case reports Bledsoe's experts discussed during their testimony were not designed to evaluate the strength of an association between Monster Energy and cardiovascular effects because none of them used a control or comparison group. He said the reports could be useful for generating hypotheses, but lack epidemiological value for demonstrating association or causation. "The bottom line is [they're] not an analytical epidemiologic investigation. [¶]. . . [¶] These are not studies that provide information to evaluate risk."

E.     *Verdict and Bledsoe's Motion for New Trial*

The verdict form for this phase of the trial asked the jury to answer a single question, "Was Monster Energy drink a substantial factor in causing [Bledsoe's] harm?" Shortly after retiring to deliberate, the jury returned a unanimous defense verdict.

Bledsoe filed a motion for new trial on the same two principal grounds he raises in this appeal. The judge denied the motion, explaining she had made the challenged rulings after spending a significant amount of time researching the issues and discussing them with the parties. "I didn't make those decisions lightly. I actually thought quite a lot on them before I made them in the midst of trial. It wasn't something I just did on a whim."

Bledsoe filed a timely notice of appeal.

## II

## ANALYSIS

A.     *Bifurcation*

Bledsoe argues the judge committed reversible error by bifurcating the issue of causation.[1] We disagree.

---

[1] Though his notice of appeal says he's appealing from a judgment after a jury trial, Bledsoe's opening brief frames his appeal as a challenge of the judge's order denying his motion for new trial (even though the brief challenges multiple rulings that were not the subject of his motion for new trial). "An order denying a motion for new trial is nonappealable," though the order "may be reviewed on appeal from the underlying judgment." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) As we construe Bledsoe's arguments on appeal, he intends to challenge the rulings and orders the judge made during trial, not her denial of the motion for new trial.

23

A trial judge has broad case management discretion, which includes the authority "to order separate trials of issues and determine the order in which those issues are to be decided." (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 762 (*Huff*).) Code of Civil Procedure section 1048 authorizes a judge to "order a separate trial of any cause of action . . . or of any separate issue or of any number of causes of action or issues." (Code Civ. Proc., § 1048, subd. (b).) The judge may bifurcate causes of action or issues in a number of circumstances, including "when separate trials will be conducive to expedition and economy." (*Ibid.*)

Additionally, section 598 of the Code of Civil Procedure allows a judge to—on their own motion and *at any time*—bifurcate any issue for trial "when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted." This provision contemplates precisely what happened in this trial. "Where trial of the issue of liability *as to all causes of action* precedes the trial of other issues or parts thereof, and . . . the verdict of the jury upon such issue so tried is in favor of any party on whom liability is sought to be imposed, judgment in favor of such party shall thereupon be entered and no trial of other issues in the action as against such party shall be had unless such judgment shall be reversed upon appeal or otherwise set aside or vacated." (Code Civ. Proc., § 598, italics added.)

The Legislature enacted Code of Civil Procedure section 598 "to encourage the trial court, on its own motion, to make orders to try any issue or any part thereof prior to the trial of any other issue in the interest of 'the economy and efficiency of handling the

24

litigation.'" (*Buran Equipment Co. v. H & C Investment Co.* (1983) 142 Cal.App.3d 338, 343 (*Buran*).) On appeal, our standard of review is deferential. "We would reverse a decision regarding the management of a case for trial and the order in which issues are to be tried only for a manifest abuse of discretion." (*Huff*, *supra*, 23 Cal.App.5th at p. 763.)

Bledsoe's challenge to the judge's decision is easily dispatched. This was a case with several claims under various theories—strict products liability, negligence, fraud, and deceptive trade practices. As a result (and as even a cursory look at the motions in limine suggest), trial on all of the claims would involve evidence on a wide range of distinct issues, like Monster's product design and advertising strategies, the extent of their knowledge of other similar incidents, the industry standard for warning labels on energy drinks, and assigning a numerical figure to Bledsoe's injuries, to name some. This would take multiple days of trial and no doubt require testimony from experts in several different fields.

Causation is the only requirement common to all of Bledsoe's claims. It is a threshold issue that, compared to the other issues in the case, is relatively simple (or at least highly focused). This fact alone reasonably supports a decision to try the issue first. (See, e.g., *Grappo v. Coventry Financial Corp.* (1991) 235 Cal.App.3d 496, 504 [concluding trial judge acted well within its discretion when they ordered the "initial threshold" issue tried first]; *Buran*, *supra*, 142 Cal.App.3d at pp. 343-344 [trying threshold issue first promotes judicial economy]; see also *Shetterly v. Raymark Industries, Inc.* (4th Cir. 1997) 117 F.3d 776, 782 [judge acted reasonably in trying first

25

the issue of whether asbestos inhalation "was a substantial factor in [plaintiffs'] illness" before "moving to the question of negligence, strict liability or damages"]; *In re Bendectin Litigation* (6th Cir. 1988) 857 F.2d 290, 309-314 (*Bendectin*) [upholding judge's decision to trifurcate case and try causation first]; *In re Beverly Hills Fire Litigation* (6th Cir. 1982) 695 F.2d 207, 210, 216 (*Beverly Hills Fire*) [upholding judge's decision, made "[s]hortly before the trial was scheduled to begin," to bifurcate the issue of whether defendant's product caused the fire because record demonstrated the trial court "considered both the projected length of the trial and the likelihood that a resolution of the causation issue could shorten it"]; *Beeck v. Aquaslide 'N' Dive Corp.* (8th Cir. 1977) 562 F.2d 537, 542 [concluding "[j]udicial economy, beneficial to all the parties, was obviously served by the trial court's grant of a separate trial" on the threshold issue of whether defendant manufactured the product at issue because the "[e]vidence of plaintiffs' injuries and damages would clearly have taken up several days of trial time, and because of the severity of the injuries, may have been prejudicial to the defendant's claim of non-manufacture"].)

But this case presented an even more compelling case for bifurcation because there was seemingly strong evidence of an alternate cause: the police report from the incident says there was a plate of food near Bledsoe and his brother reported having removed a large piece of food from his mouth; Detective Vara said during her deposition she remembered seeing a plate of food next to Bledsoe; the medical records indicated Bledsoe had pulmonary infiltrates in his chest and was exhibiting rhonchorous breathing

26

when he arrived at the hospital. In short, this case presented a textbook example of bifurcating to promote judicial economy. Because causation was a dispositive issue if decided against Bledsoe, bifurcating had the potential to significantly shorten trial. Given all of these considerations, the judge's decision to bifurcate fell well within the bounds of reason.

Bledsoe raises a number of arguments to the contrary, none of which we find persuasive. First, he argues causation and liability are "so inextricably intertwined that bifurcation of the two issues is an abuse of discretion." We don't agree. Proving that Monster Energy caused Bledsoe's cardiac arrest requires evidence about Bledsoe (e.g., his medical history, his actions leading up to the cardiac arrest, and what responders and doctors observed when treating him) and about the safety of the ingredients in Monster Energy. This evidence is distinct from that which would be necessary to prove liability, which would include, for example, evidence about whether Monster knew their product could cause adverse health effects and whether they took appropriate steps to warn consumers about those effects.

Next, Bledsoe argues the judge improperly favored the convenience of the jury over that of the witnesses. He points to various statements the judge made during bifurcation discussions about the juror's time, like when she said, "I understand there's certain witnesses that you've indicated would have to potentially come back twice, but when I weigh that against the time that the jury may or may not be here, I don't see that outweighing that if, in fact, they find in favor of [Monster]." According to Bledsoe, the

judge cared more about getting the jurors out early than whether witnesses would have to return to testify in a later phase. But juror convenience is an entirely valid factor for the bifurcation analysis; it's the necessary upshot of promoting judicial economy in a jury trial. The judge made this point during the discussion when she explained she had a "duty to make sure cases are tried most efficiently and that the jurors' time is not wasted if not necessary." This is precisely the type of consideration Code of Civil Procedure section 598 encourages judges to make, and there's no authority for the proposition that some witnesses having to testify twice would override the goal of promoting judicial economy. (See, e.g., *Buran*, *supra*, 142 Cal.App.3d at pp. 343-344 [concluding that by ordering a threshold issue to be tried first, "the trial judge acted in full compliance with the direction of the Legislature to promote economy and efficiency in the handling of litigation" because if plaintiff could not prove the issue, trial would be markedly shorter].)

Bledsoe also argues that having to try causation first created "an optical and oratorical compromise to the prosecution of the case, and it slowed the rhythm of litigation." Courts have rejected this kind of atmospheric or case presentation argument. For example, in *Buran*, the appellant argued the judge's mid-trial decision to try a threshold issue first was prejudicial to its case because it "interrupted [its] presentation of evidence." (*Buran*, *supra*, 142 Cal.App.3d at p. 343.) The appellate court concluded that a party's preferred strategy for presenting evidence must give way to the judge's authority to regulate the order of proof, observing "the trial judge is to be commended for ordering that this issue be tried first and a decision reached upon it since, if it had been

28

correctly decided, trial would not have been required of any other issues." (*Id.* at p. 344; see also *Bendectin*, *supra*, 857 F.2d at p. 314 [rejecting plaintiffs' argument that trying causation first "unfairly prejudiced presentation of their case"].)

We are cognizant of the danger, acknowledged by the Sixth Circuit in *Beverly Hills Fire*, that bifurcation may in certain circumstances deprive a plaintiff of "their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought into the court, replacing it with a sterile or laboratory atmosphere in which causation is parted from the reality of injury." (*Beverly Hills Fire*, *supra*, 695 F.2d at p. 217.) But that is not what happened in that case, and that is not what happened here, either. Like the plaintiffs in *Beverly Hills Fire*, Bledsoe was able to "apprise the jury of the general circumstances of the tragedy and the environment in which [his injuries] arose." (*Ibid.*) During trial, he presented argument and evidence regarding the nature of his injuries, the circumstances under which they'd occurred, and his theory they were the result of the synergistic effects of the caffeine, taurine, and guarana in Monster Energy. Not being able to introduce evidence about the other liability issues in the case like failure to warn or negligence did not impact his ability to present a case on causation.

Bledsoe argues bifurcating causation prejudiced his case because it gave the jurors an incentive to find in favor of Monster—rendering a defense verdict meant they'd avoid a lengthy trial during the holiday season. This argument requires us to assume the jurors ignored the instruction the judge gave at the beginning of trial. After ordering causation

29

bifurcated, she told counsel for both sides, "I don't want the jury to be prejudiced thinking we are going to get out of here if we decide in defendant's favor. That's something I want to ensure is not going to happen, and both sides are going to be advised that can't come up in trial. That would be subject to a motion for mistrial because [the] jury is not going to be prejudiced to think they can get out of here sooner if they have a defense verdict. I will assure that does not happen." The judge then drafted an instruction, with input from the parties, which Bledsoe's counsel approved. The instruction said, "I've ordered that the trial of this action be divided into separate stages. During the first stage, you will decide whether a Monster Energy drink was a substantial factor in causing Plaintiff's harm. Immediately after rendering your decision, we will move directly into the second stage. Do not concern yourself, speculate, or form opinions as to the issues to be decided in any subsequent stage." We assume the jury understood and followed this instruction. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433 ["'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions'"].)

Finally, Bledsoe argues bifurcation weakened his opening statement by prohibiting him from giving "a cohesive, complete picture of his multiple causes of action" and created a "lopsided" trial where Monster had eight experts and he only two. These complaints boil down to a disagreement over how the judge regulated the order of proof, an area in which a trial court enjoys broad discretion. The jury was aware that they weren't getting the full picture of Bledsoe's claims against Monster—this was explained

30

to them by both the judge and Bledsoe's counsel during opening statement. And as far as the number of experts, neither side changed the number of causation experts they were presenting as a result of the bifurcation order. Bledsoe was always going to put forward two experts on causation.

But more fundamentally, Bledsoe's arguments fail to acknowledge the most crucial point, that there was compelling evidence of an alternate cause of his cardiac arrest. The failure runs so deep that he neglected to mention in his briefing that the jury heard evidence he choked on a large piece of food and suffers from an underlying cardiac abnormality that places him at a high risk of cardiac arrest. His opening brief summarizes only his own experts' testimony and leaves out any summary of Monster's case. Thus, after reading his brief, we were only aware of what happened in the first half of trial. An appellant must summarize and discuss all the evidence—both favorable *and unfavorable* to their position—that supports the rulings they are challenging on appeal (E.g., *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

Having, however, reviewed all of the evidence presented to the jury, we conclude Bledsoe was not prejudiced by the bifurcation order. He was always going to have to prove causation, which means he was always going to have to respond to the evidence of choking and his early repolarization syndrome, and he was always going to have to contend with the fact that no one saw him take more than a couple sips of Monster Energy. In short, the jury's verdict was a result of the state of the evidence on causation, not the fact it was tried first.

B.    *Exclusion of Expert Reliance Material*

After holding Evidence Code section 402 hearings for Dr. Lipshultz and Dr. Shah, the judge prohibited them from relying on certain types of material. Bledsoe argues this ruling was an abuse of her discretion as a "gatekeeper" of expert testimony. We conclude there was no error, but even so, it would be harmless.

1.    *Relevant background*

The reliance material at issue here falls into three basic types. First are incident reports from the FDA and poison control centers worldwide. The FDA keeps a publicly available database of "MedWatch" forms, which are forms consumers submit alleging they experienced an adverse effect from a food, dietary, or cosmetic product. In response to an information request, the FDA provided Bledsoe's counsel with a spreadsheet of every incident report that mentioned any variety of energy drink in Monster's energy drink line. The spreadsheet contains minimal detail: a column for date, product name, symptom, and outcome. The products ranged from "Monster blue low carb energy drink" to "java Monster plus energy energy drink Russian flavor," but the alleged or self-reported symptoms were even more wide ranging. Some of the consumers reported experiencing cardiac arrythmia, but other symptoms reported include conjunctivitis, diarrhea, bipolar disorder, chest pain, vomiting, rhabdomyolysis, salmonella, flu, anxiety, delusion, fatigue, and muscle spasms. The reported outcomes ranged from nonserious illness, to hospitalization, to death. The FDA makes the following disclosure about the incident reports, "The adverse event reports about a product and the total number of

32

adverse event reports for that product . . . only reflect information AS REPORTED and do not represent any conclusion by FDA about whether the product actually caused the adverse events."

At his Evidence Code section 402 hearing, Dr. Lipshultz testified that these adverse event reports are "really the gold standard for those of us that look for are there health consequences to supplements, food, or medications." He said that while a single reported adverse event could just be "a random association," if you start to see "consistency of rare events occurring with enough frequency you can establish that *regardless of other factors* there *seems to be an association*." (Italics added.)

In a similar vein, he also sought to rely on an article that summarized energy drink related data from poison control centers around the world. He said the data demonstrates an "association" between energy drink consumption and cardiovascular effects. He acknowledged the article summarizing the data did not specify the type or brand of energy drink that was consumed, and he also acknowledged that many of the underlying incidents involved circumstances not present in this case, such as subjects with diabetes or subjects who mixed energy drink consumption with alcohol, marijuana, or tobacco.

The second category of material consists of published case studies reporting correlations between energy drinks and cardiovascular effects. Some of the publications described the results of volunteer-based studies documenting cardiovascular effects followed by energy drink consumption, and other publications compiled case reports from physicians whose patients consumed energy drinks and also experienced

33

cardiovascular effects. Dr. Lipshultz said it was a generally approved approach in the medical community to treat energy drinks as a class. He said the three leading energy drinks (Red Bull, Rockstar, Monster) contain similar ingredients and amounts of ingredients, but beyond that he made no attempt to describe how these articles and case reports involved circumstances similar to Bledsoe's.

The third category consists of evidence relating to a prior lawsuit against Monster. In his hearing, Dr. Shah said he intended to rely on his experience as the treating physician for a person name Jason Hamric, as well as his experience as an expert witness in Hamric's lawsuit against Monster. He said Hamric's case was similar to Bledsoe's. When Hamric was 19 years old, he suffered a cardiac arrest and nearly died after chugging two cans of Monster Energy on a dare.

During cross-examination, Monster's counsel showed Dr. Shah evidence in the form of witness declarations, deposition testimony, and Hamric's medical records that suggested Hamric's case circumstances were different from Bledsoe's. It appears there was a dispute over whether the energy drink Hamric had consumed before the incident was Monster Energy, whether he had diabetes and ALS or muscular dystrophy, and whether he was born with a serious heart condition that required surgery.

At the conclusion of the experts' hearings, the judge ruled they could not rely on any consumer incident reports or poison control data because they didn't contain sufficient information to be reliable or to support an opinion that Monster Energy causes cardiac arrythmias. "[A]s a gatekeeper, why should I allow the [experts] to testify as to

34

all of these other case reports, incidents, poison control reports that have all of these factors that weren't involved in this case . . . ?" Specifically as to the FDA incident reports, the judge found they "did not provide enough information to warrant it being reliable for an expert to base their opinion on."

The judge clarified that Bledsoe's experts could rely on case studies involving Monster Energy, but not studies or articles that discuss associations between cardiovascular effects and energy drinks generically, without identifying brand, type, or ingredients. Finally, the judge ruled she was excluding any evidence about the Hamric case under Evidence Code section 352 because introduction of the evidence would lead to "a trial within a trial," resulting in undue consumption of time and confusion of the issues.

### 2. *Applicable legal principles*

Trial judges have a "substantial 'gatekeeping' responsibility" to ensure that an expert's opinion is based on both reliable *material* and sound *reasoning*. (*Sargon*, *supra*, 55 Cal.4th at p. 769.) The source of this gatekeeping responsibility is Evidence Code sections 801 and 802.

Evidence Code section 801 limits expert testimony to opinions that are related to a "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and that are "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subds. (a) & (b).) Evidence Code

section 802 provides that a witness, including an expert, may "state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." In other words, "Evidence Code section 801 governs judicial review of the *type* of matter; Evidence Code section 802 governs judicial review of the *reasons* for the opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 771.)

Judges must thus give "critical consideration [to the expert's] reasoning." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1136 [excluding poorly reasoned expert valuation].) "[A] court may inquire into, not only the *type* of material on which an expert relies, but also whether that material *actually supports* the expert's reasoning." (*Sargon*, *supra*, 55 Cal.4th at p. 771, italics added.) "[T]he matter relied on must provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible." (*Id.* at p. 770.)

"The trial court's preliminary [or gatekeeping] determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a *reasonable basis* for the opinion or whether that opinion is based on *a leap of logic or conjecture*. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, *as a matter of logic*, the studies and other information cited by experts adequately support the conclusion that the

36

expert's general theory or technique is valid." (*Sargon*, *supra*, 55 Cal.4th at p. 772, italics added.)

The facts of *Sargon* are illustrative. In that case, our Supreme Court upheld the trial judge's decision to exclude an expert's opinion on the amount of lost profits Sargon, a small dental implant company, suffered as a result of a university's breach of their agreement to clinically test a new implant the company had patented. (*Sargon*, *supra*, 55 Cal.4th at p. 753.) Sargon claimed that, but for the university's breach, they would have become a worldwide leader in the dental implant industry and made many millions of dollars a year in profit. They sought to present the testimony of their expert accountant, who had concluded that their lost profits ranged from $220 million to $1.18 billion. (*Id.* at p. 755.) To reach this opinion, the expert had used a market share approach that compared Sargon to six large, multinational medical companies (including AstraZeneca, for which dental implants was only one of many divisions within the company). (*Id.* at pp. 753-767.)

During a hearing to determine whether to allow the expert to present his opinion to the jury, he explained why he had compared Sargon to the multinational companies rather than other smaller, regional dental implant companies currently in business. He said he believed Sargon, unlike the other smaller companies, would, over time, have become a market leader, one of the "Big Six" because its product was more "innovative" than the products marketed by the smaller companies. (*Sargon*, *supra*, 55 Cal.4th at p. 759.) "In calculating Sargon's lost profits, he had not considered profits Sargon had ever actually

realized, but instead considered the market leaders' profits. He believed that Sargon's profits would have increased over time until they reached the level of one of the market leaders." (*Ibid.*)

The *Sargon* court concluded the judge had properly excluded the expert's opinion on lost profits damages as speculative, because the expert did not have a reasonable basis for comparing Sargon to six multinational companies "rather than the smaller ones that appear to have far more closely resembled it." (*Sargon*, *supra*, 55 Cal.4th at p. 777.) His projections assumed that, like much larger competitors, Sargon's product was innovative, but he did not provide any "evidentiary basis that equates the degree of innovativeness with the degree of difference in market share." (*Id.* at p. 778.) In other words, there was "'simply too great an analytical gap between the data and the opinion proffered.'" (*Id.* at p. 771.)

### 3. *Application*

A judge has broad discretion to exclude or admit expert testimony under Evidence Code sections 801 and 802 and to exclude evidence under Evidence Code section 352. We may overturn an evidentiary ruling only if we conclude it is arbitrary or irrational. (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

We conclude the judge's gatekeeping decisions in this case were reasonable. Neither Dr. Lipshultz nor Dr. Shah provided any basis to conclude consumer incident reports, poison control data, or publications about energy drinks as a class are the type of

material that reasonably could be relied upon by an expert in the field of cardiology to form an opinion about whether a particular product can cause cardiac arrests.

Dr. Lipshultz said consumer incident reports were the "gold standard" for people who "look for . . . health consequences to supplements, food, or medications." But this explanation falls far short of the type of scientific rigor necessary to prove a product can cause a particular health effect. Bledsoe argues the excluded materials were a foundational piece of his experts' approach to causation, a brick in the proverbial wall of proof. He argues his experts' methodology starts by establishing associations or correlations between Monster Energy and cardiovascular effects (are there *reported instances* of energy drink consumption followed closely by cardiovascular effects?) and from there, moves on to establish general causation (*can* Monster Energy cause cardiac arrests?) and, finally, specific causation (*did* Monster Energy cause his cardiac arrest?).

The problem with this argument is even if we assume that proving general causation through correlations and associations is an accepted approach, the material at issue does not tend to demonstrate an association between cardiovascular effects and Monster Energy because of all the unknowns and confounding factors. "[T]he gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (*Sargon*, *supra*, 55 Cal.4th at p. 772.) The FDA incident reports are simply uninvestigated allegations from consumers self-reporting on symptoms they experienced

39

in some unspecified relation to Monster's products. In deciding the incident reports did not support an intellectually rigorous expert opinion, the judge needed to look no further than the FDA's own disclaimer, which warns that the reports contain unsubstantiated allegations only. Bledsoe's experts' approach would treat them as facts.

The judge also had a reasonable basis for excluding testimony regarding the poison control data and articles involving energy drinks as a class. Like the expert in *Sargon* who was unable to provide a rational basis for comparing a small company to multinational companies, Bledsoe's experts failed to provide a sound basis for relying on data concerning different or unspecified energy drinks. As the judge pointed out, there are myriad types of energy drinks on the market, each with their own blend of ingredients. The poison control data presented an additional issue—not only did the data not break down the energy drinks by brand or type, the compiled incidents involved various confounding factors like drug use and health conditions. (See, e.g., *Brake v. Beech Aircraft Corp.* (1986) 184 Cal.App.3d 930, 937 [in a products liability lawsuit following a plane crash, the judge properly prohibited expert from relying on a statistical analysis comparing accident rates for the defendant's aircraft with rates for other aircraft].) Given the confounding factors and unknowns in the poison control data and articles about energy drinks as a class, the judge could reasonably conclude that relying on them to form an opinion that Monster Energy causes cardiac arrythmias requires "a leap of logic or conjecture." (*Sargon*, *supra*, 55 Cal.4th at p. 772.)

Finally, we conclude the judge properly excluded evidence regarding the facts of the Hamric case under Evidence Code section 352. That provision allows a judge to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. (Evid. Code, § 352.) As we've seen, during Dr. Shah's hearing, Monster's counsel raised several differences between the Hamric case and the facts of this case and argued they were prepared to relitigate the Hamric case if need be. This exchange provided a reasonable basis for the judge to conclude that allowing evidence of Hamric's cardiac arrest would create a trial within a trial and be unduly time consuming.

But most importantly, even if we assume the exclusion of this material was error, Bledsoe once again cannot demonstrate that "a different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.) At best, the excluded material would lead the jury to conclude that there is a wealth of data showing a correlation or association between energy drink consumption and adverse cardiovascular effects, including cardiac arrests. But as we've discussed, the jury heard no direct evidence that Bledsoe drank more than a few sips of Monster Energy before his cardiac arrest, Monster presented a suite of evidence about ingredient safety that was *specific to Monster Energy*, and there was compelling evidence of an alternate cause that had *nothing to do with energy drinks*. On this record, the jury's verdict was unlikely to change no matter how much evidence was introduced to show that drinking

41

Monster Energy is associated with the kind of cardiovascular effects that can lead to arrythmias.

C.    *Additional Claims of Error*

1. *Exclusion of the "Davis Memo"*

Before trial, Monster filed a motion in limine to exclude a memo written by Dr. Davis in 1995 for Monster's predecessor, a beverage company called Hansen's Natural.



The judge granted Monster's motion in part, ruling the memo was irrelevant to the issue of causation and thus could not come in during phase one. However, she said the memo would be admissible during the second phase of the trial because it was relevant to the issue of knowledge or notice in the failure to warn context. Bledsoe argues this ruling was error and prejudiced his case because the jury heard only a one-sided view of the health effects of caffeine. He argues that while Monster was allowed to put on expert

testimony about caffeine's "general safety," he wasn't allowed to introduce evidence that



We don't read the trial record or the memo that way. Both sides were allowed to, and did, introduce expert opinion about the safety of the ingredients in Monster Energy. Monster's toxicology and pharmacology experts testified that the amount of caffeine in the beverage is safe, while Bledsoe's experts testified that the caffeine, in combination with taurine and guarana, caused various cardiovascular effects like prolonged QT intervals and platelet aggregation. But more importantly, the judge correctly concluded the memo was irrelevant to determining whether Monster Energy caused Bledsoe's cardiac arrest.

We find it telling that in his opposition to Monster's in limine motion to exclude the memo, Bledsoe argued the memo was relevant to the issue of *notice* and never contended it was relevant to causation.

In any event, even if the ruling were error, it wouldn't be prejudicial because the judge allowed Bledsoe to show the jury a video of Dr. Davis's deposition testimony in which he agreed that consuming Monster Energy could increase blood pressure and heart rate. Compared to Dr. Davis's statements in an over 20-year-old memo, this testimony is stronger evidence for Bledsoe's case because it at least relates to the product on trial.

### 2. *Jury instructions and verdict form*

The judge instructed the jury with CACI No. 430, the standard CACI instruction on causation in a product liability/personal injury case. As we've seen, the verdict form asked: "Was Monster Energy drink a substantial factor in causing Plaintiff's harm?"

Bledsoe argues the judge erred by failing to give jury instructions and a verdict form that walked through the elements of each of his causes of action and complains that neither the instructions nor the verdict form mention product liability concepts like defective product or design or failure to warn. He argues the judge should have provided the product liability instructions in the CACI 1200 series. (See CACI 1203 [strict product liability-design defect]; CACI 1205 [strict product liability-failure to warn]; CACI 1220 [negligence]; CACI 1222 [negligent failure to warn]; CACI 1901 [fraudulent concealment]; CACI 1231 [breach of implied warranty].)

Such instructions would have been improper because the only issue before the jury in this phase of the trial was causation. The inclusion of instructions on product liability concepts in the instructions or verdict form would have been confusing to the jury because they hadn't heard any evidence on those issues. In civil cases, "'[a] party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him *which is supported by substantial evidence*.'" (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217, italics added.) Because the evidence in this case was limited to causation, Bledsoe was not entitled to instructions on issues that were not before the jury.

We also reject Bledsoe's contention that the verdict form's use of the term "substantial factor" introduced a confusing new concept on the last day of trial and in so doing "pushed jurors toward finding that new and ambiguous phrase unsatisfied by Bledsoe." The argument misrepresents the record. The term was neither new nor undefined. Both parties used it throughout trial, starting with their opening statements, and CACI No. 430 provided the jury with the following definition of the term: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." In his closing argument, Bledsoe's counsel highlighted this definition and discussed it at length, arguing, among other things, that "there can be a lot of potential factors that cause the harm, and it doesn't even have to be more than 50 percent. It just has to be more than a trivial factor." The claim the term was

new and confusing for the jurors has no merit. As a final point, Bledsoe forfeited this argument anyway by agreeing to the use of this verdict form. (E.g., *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 914 [failure to object or raise an argument in the trial court forfeits the issue on appeal].)

### 3. *Dr. Roberts' testimony*

As we've seen, Dr. Roberts presented his report on the ingredients in Monster Energy to a panel of experts to reach their own conclusions about the ingredient's safety. During his direct examination, counsel for Monster walked him through three of the ingredients—caffeine, taurine, and guarana—and asked for his conclusion as well as that of the expert panel. By the time counsel reached the third ingredient, guarana, Bledsoe's counsel objected that it was hearsay for the witness to relay the panel's conclusion to the jury. The judge overruled the objection and Dr. Roberts responded that, as with caffeine and taurine, the panel concluded guarana was safe.

Even if we assume this ruling was erroneous, it in no way prejudiced Bledsoe's case. For starters, Bledsoe didn't object until counsel reached the third and final ingredient in the list. By that time, the jury had already heard testimony that the panel had found the level of caffeine (the most important ingredient from a cardiovascular perspective) in Monster Energy was safe. But more importantly, over the 10 days of trial, the jury heard compelling evidence of an alternate cause of Bledsoe's injuries. This evidence reduced any opinion about the safety of guarana, a low-caffeine herbal extract, a relatively minor point in the trial.

### 4. *Juror No. 9*

After the close of evidence and after the judge denied Monster's motions for directed verdict and nonsuit, she informed the parties she had just received a letter from Juror No. 9 asking to be relieved because she was suffering financial hardship. The juror said she had a job interview during voir dire, was later offered the position, and needed to start working soon. The judge told counsel she intended to wait until the jury returned a verdict on this phase before deciding whether to relieve the juror. Bledsoe's counsel said, "That's fine by us," and declined the judge's invitation to read the letter.

Bledsoe now complains the judge's failure to relieve Juror No. 9 before deliberations was error and prejudiced his case by "incentivizing a quick defense verdict." Considering Bledsoe agreed with the decision to wait until phase one was complete, and considering the judge could not discharge the juror unless she concluded the juror had shown an inability to perform her duty in an unbiased manner, we conclude there was no error. (See *Shanks v. Department of Transportation* (2017) 9 Cal.App.5th 543, 550 [appellate court reviews a decision to discharge a juror under the "demonstrable reality" standard, which is stricter standard than the substantial evidence standard, and entails a review of "the entire record to determine if the trial court actually relied on evidence that supported a conclusion that bias was established"].) Additionally, because the verdict was unanimous, Bledsoe cannot show that the replacement of a single juror was likely to make a difference in the outcome of the case. (Cal. Const., art. I, § 16 [in civil cases, "three-fourths of the jury may render a verdict," unanimity is not required].)

47

## III

## DISPOSITION

We affirm the judgment. Bledsoe shall bear costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH

J.

We concur:


CODRINGTON

Acting P. J.


RAPHAEL

J.